MARCH 13, 1984

No. 83–5720. AUTRY *v.* MCKASKLE, ACTING DIRECTOR, TEXAS DEPARTMENT OF CORRECTIONS. C. A. 5th Cir. Certiorari denied. 

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

It is not unusual for this Court to spend considerable amounts of time deliberating over difficult issues presented in a petition for a writ of certiorari. Yet in this case, where the constitutional validity of a death sentence is challenged on a variety of substantial grounds, the Court is dramatically expediting its normal deliberative processes to clear the way for an impending execution.

Unfortunately, this case is not an aberration but is part of a pattern of recent decisions in each of which the Court has shown an unseemly desire to bring litigation in a capital case to a fast and irrevocable end. See, *e. g., Woodard* v. *Hutchins,* 464 U. S. 377, 383 (1984) (BRENNAN, J., dissenting) (criticizing "rush to judgment" in decision to vacate stay of execution); *ibid.* (WHITE and STEVENS, JJ., dissenting); *id.,* at 383–384 (MARSHALL, J., dissenting); *Autry* v. *Estelle,* 464 U. S. 1, 5–6 (1983) (STEVENS, J., dissenting) (criticizing decision to deny stay of execution pending filing and disposition of petition for certiorari); *Barefoot* v. *Estelle,* 463 U. S. 880, 914–916 (1983) (MARSHALL, J., dissenting) (criticizing suggestion that courts of appeals may adopt special,

summary procedures for cases in which a stay of a death sentence has been requested).

Among the materials presently before the Court pertaining to petitioner's conviction and sentence are an application for a certificate of probable cause, two petitions for certiorari, and an application for a stay pending disposition of the latest petition for certiorari. See *Autry* v. *McKaskle, post*, p. 1090. Despite the fact that the petition in No. 83–5720 was still pending in this Court, the State set the date for petitioner's execution during our recess. Aware that the State cannot execute petitioner while his various petitions are pending in this Court, cf. *United States* v. *Shipp*, 203 U. S. 563 (1906), and yet unwilling to postpone petitioner's scheduled execution even a day or so, the Court has cut short its consideration of petitioner's multifarious claims. I, for one, feel unfairly pressed by the Court's insistence upon expedited procedures in death cases.[1]

As an indication of the serious nature of the questions petitioner poses, I shall briefly discuss two issues raised in one of his petitions for certiorari, No. 83–5720, that clearly merit plenary review. I fear that, in our rush to judgment, we could be overlooking still other important claims.

The first issue posed in No. 83–5720—whether the State wrongfully denied immunity to a witness necessary to petitioner's defense—implicates a conflict among the Federal Courts of Appeals regarding the proper standards for testing such claims. The second issue involves substantial allegations that petitioner was convicted on the basis, at least in part, of statements made as a result of beatings administered by police—allegations that have never been adequately addressed by the courts below.

Petitioner, James David Autry, was convicted and sentenced to death for murdering a clerk while attempting to rob a convenience store.[2] For the purpose of evaluating his petition for certiorari, two sets of circumstances are significant. First, petitioner unsuccessfully requested the trial court to grant his codefendant, John Alton Sandifer, use immunity for his eyewitness testimony

---

[1] In this case, for example, the Court voted to deny all of petitioner's requests for relief while this opinion was still being prepared.

[2] One way to trigger the Texas death penalty statute is intentionally to commit murder in the course of committing or attempting to commit robbery. Tex. Penal Code Ann. § 19.03(a)(2) (1974).

regarding the events that transpired at the scene of the crime. According to petitioner, Sandifer's testimony would confirm petitioner's story that neither a robbery nor an attempted robbery occurred at the store. If not committed in the course of a robbery or attempted robbery, the murder would not constitute a *capital* crime. Although the prosecution granted immunity to three of Sandifer's relatives, it did not grant immunity to Sandifer himself. As a result, he refused to testify on petitioner's behalf for fear that the State would subsequently use his testimony against him. Second, Autry alleges that, after he was arrested, he was subjected to physical abuse by police and that, as a result of these beatings, he made a written confession and later repeated certain portions of his confession during a telephone call to his mother that was made within earshot of police officers. The written confession was later suppressed. However, the trial court admitted into evidence the testimony of an officer who overheard petitioner's conversation with his mother.

## I

Petitioner contends that the trial court committed constitutional error when it refused to grant use immunity to Sandifer. In support of this claim, petitioner cites decisions by the Third Circuit recognizing that, under certain conditions, a defendant has a right, under the Due Process Clause, to a judicially administered grant of immunity to a witness whose testimony is essential to an effective defense. See *Government of Virgin Islands* v. *Smith*, 615 F. 2d 964 (1980); *United States* v. *Herman*, 589 F. 2d 1191 (1978); *United States* v. *Morrison*, 535 F. 2d 223 (1976). Here, petitioner claims that Sandifer's testimony was essential to an effective defense because it would show that the elements that elevated his crime to a capital offense—robbery or attempted robbery in the course of an intentional homicide—were simply not present in the conduct for which petitioner has been sentenced to death. The Court of Appeals for the Fifth Circuit justified its denial of petitioner's request for habeas corpus relief in part on the basis of its disagreement with the line of cases decided by the Third Circuit. According to the Fifth Circuit, a trial court is not required to grant immunity to a defense witness simply because that witness has essential exculpatory information unavailable from other sources. *Autry* v. *Estelle*, 706 F. 2d 1394, 1400–1403 (1983); *United States* v. *Thevis*, 665 F. 2d 616, 638-641 (1982). Certiorari

should be granted to resolve this conflict,[3] especially inasmuch as it arises in a case in which a death sentence has been imposed.

The Court of Appeals also suggested that, in this case, "differences among the circuits are . . . a strawman because Autry fails all their tests." *Autry* v. *Estelle, supra,* at 1401. Its contention that Autry would be ineligible for relief even under the Third Circuit's less restrictive standard was based upon the Fifth Circuit's view of the likely nature of Sandifer's testimony were he to be granted use immunity. The District Court and the Court of Appeals both found that Sandifer's testimony was unlikely to be exculpatory. Their conclusion stemmed from their evaluation of a confession that Sandifer gave to the police soon after his arrest. Petitioner claimed that Sandifer's confession tended to exculpate petitioner because it made no mention of a robbery, thus supporting other evidence tending to show that no robbery of the convenience store was either intended or accomplished. The Court of Appeals rejected petitioner's claim because it found that Sandifer's confession inculpated petitioner inasmuch as Sandifer named petitioner as the triggerman in the shootings. Indeed, the Court of Appeals concluded that the State's case would actually have benefited from Sandifer's testimony. The Court of Appeals' finding on this issue derives from a misunderstanding of petitioner's argument. Petitioner does not claim that Sandifer's testimony would exonerate him of wrongdoing; he claims merely that that testimony would show that no robbery attended the shootings at the convenience store. Sandifer's testimony might have enhanced the State's ability to show that petitioner had committed murder, but

---

[3] As the Fifth Circuit has noted:

"The Supreme Court has not decided whether courts may grant defense witnesses use immunity, and the circuit courts which have addressed the issue have produced widely divergent opinions. On the question whether judicial use immunity is necessary for essential exculpatory testimony, the courts have split three ways. The Third Circuit . . . held that such immunity is available in certain circumstances. On the other hand, the Seventh, Eighth and District of Columbia Circuits have ruled that such immunity is unavailable. . . . The remaining circuits which have addressed the issue have denied immunity in the specific cases before them, but left open whether immunity would ever be available." *United States* v. *Thevis,* 665 F. 2d, at 639 (footnote omitted).

Although the Fifth Circuit has never explicitly determined whether due process may require a trial court to grant a defendant use immunity, its decisions imply that courts lack such power under any circumstances. *Id.,* at 639, n. 25.

would have materially weakened the State's contention that petitioner committed *capital* murder within the meaning of the pertinent Texas statute.

## II

The second issue presented in the petition involves the admissibility of testimony by a police officer regarding statements that the officer heard petitioner make to his mother during a telephone conversation. Prior to the conversation, petitioner had given the police a written confession that was subsequently suppressed by the trial judge. Petitioner claimed that the confession was the result of beatings administered by the police, a claim that was contradicted by the interrogating officers. The trial court did not resolve the issue whether the confession was the product of physical coercion. Rather, it suppressed the confession based upon a finding that the police previously had failed to honor petitioner's request that the interrogation be terminated. *Autry* v. *Estelle, supra,* at 1403. Petitioner claims that the incriminating statements he made during his conversation with his mother stemmed from the tainted written confession because he was afraid that he would again be punished if, during his conversation, he said anything inconsistent with the confession that had just been wrung from him. According to petitioner, one of the officers who was in the room where he made the telphone call to his mother had participated in his beating.

Substantial evidence indicates that petitioner was subjected to physical abuse. Petitioner's testimony that he was beaten was confirmed by John R. Sandifer, the father of petitioner's codefendant and an immunized prosecution witness. John Sandifer stated that when he saw petitioner in jail following petitioner's arrest and interrogation, he noticed that "[t]he left side of his face was swollen bad." Pet. for Cert. 11. Sandifer also observed that petitioner "had numerous bruises on his body. Below the belt and above the belt. . . . Looked like his ribs were broke." *Id.,* at 12. Asked whether petitioner had told him how he received these bruises, Sandifer replied: "He told me they beat him. . . . He said they beat him with a Houston telephone book. . . . He told me that they beat on him until he couldn't take no more. He said he would sign anything if they quit beating him." *Ibid.* Also available at the suppression hearing was a videotape of petitioner made by the police soon after he signed his written confessions; that tape subsequently was inexplicably lost. The trial

court denied petitioner's motion to suppress the testimony based on the overheard conversation with his mother. The trial court offered no reasons, however, for its decision and made no findings concerning the alleged beatings.

In habeas corpus proceedings, the Federal District Court handled the trial court's failure to make factual findings by assuming all of petitioner's allegations to be true. Assuming that petitioner had been beaten into signing the written confession, the District Court found that his oral declarations were "voluntary and 'sufficiently an act of free will to purge the primary taint' of the physically coerced written confessions." App. B to Pet. for Cert. 11. The Court of Appeals affirmed, emphasizing the following facts: six hours, during which petitioner was allowed to sleep in his cell, elapsed between the putative beatings and petitioner's call to his mother; petitioner himself requested to make the call; and the overheard statements were directed not to any agent of the State but rather to a private party of petitioner's own choosing. *Autry* v. *Estelle*, 706 F. 2d, at 1403.

Assuming, as did the District Court and Court of Appeals, that petitioner's allegations were true, I cannot accept the lower courts' conclusion that the overheard statements were voluntary. Petitioner made these statements in a telephone conversation conducted in the booking room of the jail while in close proximity to an officer who had recently participated in beating a confession out of him. To my mind, these circumstances raise sufficient doubt regarding the voluntariness of the statements to require suppression of the policeman's account of the conversation. I find it implausible that six hours of sleep could erase from petitioner's consciousness the fear that the earlier beatings must have engendered. Nor does the fact that he initiated the call negate the possibility that he wanted to make contact with a source of outside support and at the same time to avoid a new round of beatings for contradicting his earlier coerced confession. Assuming, as we must, that petitioner was subjected to beatings, the burden was upon the State to show that the telephone conversation was untainted by continued coercion. The State failed to sustain that burden.

For these reasons, I dissent.